James E. DANZY

v.

Robert L. JOHNSON.

Civ. A. No. 74–100.

United States District Court,
E. D. Pennsylvania.

Aug. 4, 1976.

**427**

OPINION AND ORDER

FOGEL, District Judge.

Two questions are presented in this civil rights suit for a declaratory judgment:

FIRST: Does the failure to notify a prison inmate of his statutory right to contest extradition to another state which seeks his removal for trial, violate the due process clause of the fourteenth amendment?

SECOND: Does the denial to persons extradited under the Interstate Agreement on Detainers, 19 P.S. § 1431, of those procedural rights which are afforded to individuals who, at the election of the foreign state, are extradited under the Uniform Criminal Extradition Act, 19 P.S. § 191.1 *et seq.*, violate the equal protection clause of the fourteenth amendment?

■ The action is one for a declaratory judgment; thus we are empowered to hear the matter, and to rule upon the issue raised with respect to the constitutionality of the statutes involved, without empaneling a three-judge court pursuant to 28 U.S.C. §§ 2281 *et seq. Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). *Under the facts of this case, however, we find it unnecessary to reach the significant legal questions presented, because the matter is moot. Our determination of mootness is grounded upon the undisputed facts as to petitioner's current status, and upon the nature of the relief sought.* Accordingly, a recitation of the factual history of the case is a necessary step in order to establish the basis for our decision.

## I. HISTORY OF THE CASE AND STATEMENT OF THE FACTS

Plaintiff, James E. Danzy, is an inmate of Graterford Correctional Institution in Pennsylvania. Defendant, Robert L. Johnson, was the Superintendent of the institution at all times material to this complaint. As superintendent, Johnson was responsible for the operation of the institution, and for the welfare of all inmates who were incarcerated within Graterford.

Keith Welks, Student Atty., Professor Ralph S. Spritzer, Professor Mark Spiegel, University of Pa. School of Law, Philadelphia, Pa., for plaintiff.

Maria Parisi Vickers, Asst. Atty. Gen., Michael von Moschzisker, Deputy Atty. Gen., Robert P. Kane, Atty. Gen., Com. of Pa., Harrisburg, for defendant.

The facts have been stipulated, and hence are not in dispute. Plaintiff was serving a sentence at Graterford when, on May 3, 1972, a request for temporary custody of the plaintiff, (known as a "detainer"), was lodged with Defendant by the Prosecutor of Camden County, New Jersey. Pursuant to the provisions of the Interstate Agreement on Detainers, 19 P.S. § 1431 *et seq.* (1964), plaintiff was provided with a copy of the request. However, he was not informed of any of his rights to challenge the legality of this request for his custody. Specifically, he was not informed of his right under the statute to petition the Governor of Pennsylvania to disapprove the transfer request, nor of his right to seek judicial relief through a petition for a writ of habeas corpus.

Plaintiff was not brought before any judge of a court of record of the Commonwealth of Pennsylvania. Had he been, then he would have had the opportunity to have the judge inform him of his right to counsel, and his right to challenge the legality of the request for custody. Inmates who are about to be released from custody, as well as those who have completed their sentence before a determination has been made with respect to extradition, are brought before judicial officers, and then informed of their procedural rights, if detainers have been lodged against them. The Uniform Criminal Extradition Act, 19 P.S. § 191.1 *et seq.,* mandates that such procedural rights be accorded to individuals extradited under its provisions. Plaintiff, however, only learned of his procedural rights after he had been extradited to New Jersey, and put in the custody of the officials of that state.

On June 19, 1972, plaintiff was turned over to the New Jersey officials, and thereafter was removed to Camden County jail to stand trial. Plaintiff subsequently pleaded guilty to three of six indictments.[1]

He is now back at Graterford, serving the balance of his Pennsylvania sentence of approximately sixteen to thirty-six years. The sentences imposed in New Jersey are substantially shorter than the Pennsylvania sentence and are, with one exception, being served concurrently with his Pennsylvania sentence.[2]

On January 16, 1974, plaintiff sought leave to proceed in forma pauperis against William Cahill, then Governor of New Jersey; Thomas Shusted, the Camden County Prosecutor; Mario Iavicoli, the First Assistant Prosecutor; two Camden County detectives; the Warden of the Camden County Jail; the Sergeant of the Guard of the Camden County Jail; and Robert Johnson, Superintendent of Graterford. That *pro se* complaint, filed under 42 U.S.C. §§ 1983 and 1985, alleged two clusters of constitutional violations. *First,* the due process and equal protection claims against Superintendent Johnson, related above. *Second,* an action against the New Jersey defendants based upon cruel and unusual punishment, physical injury, and denial of medical care, in connection with a riot which broke out in the Camden County Jail when Danzy was incarcerated there awaiting trial. Tying it all together was an allegation of conspiracy to deprive plaintiff of his constitutional

---

1. The charges, which were filed as Indictments Nos. 635–70, 636–70, 637–70, 638–70, 639–70 and 641–70, Camden County Court, Criminal Division, January Session, 1971 Term, included armed robbery, conspiracy, assault and battery on a police officer, possession of stolen property, and possession of a weapon, all in connection with the robbery of a bank in Camden, New Jersey. Guilty pleas were entered to Indictments Nos. 635–70, 637–70, and 638–70, and the others were dismissed.

2. Mr. Danzy is currently serving a sentence of twenty to forty years, imposed on April 20, 1972, by the Court of Common Pleas of Philadelphia County. The New Jersey sentences, imposed on October 16, 1972, are as follows: (i) Indictment No. 635–70, six to thirteen years on Count I, and two to five years on Count II, Count II to be served consecutive to Count I; all to be served concurrent with the Pennsylvania sentence; (ii) Indictment No. 637–70, seven to twelve years on Count I, and two to five years on Count II; Count II to be served consecutive to Count I; all to be served concurrently with the Pennsylvania sentence and the sentence on Indictment No. 635–70; and (iii) Indictment No. 638–70, three to five years, to be served *consecutive* to the Pennsylvania sentence.

rights. Danzy sought a declaratory judgment as to the Interstate Agreement on Detainers, and money damages for the civil rights violations.

Leave to proceed *in forma pauperis* was granted on February 13, 1974, and the complaint was considered to have been filed as of that date. Counsel, a student from the University of Pennsylvania Law School, was appointed pursuant to Rule 9½ of the Local Rules of Civil Procedure for the Eastern District of Pennsylvania. An answer was then filed by defendant Johnson. However, the defense of the New Jersey Defendants was unresolved for some time. When that matter was finally resolved, the student originally appointed was no longer able to represent Mr. Danzy, and another student was appointed in his stead.

At the suggestion of the Court, in an effort to clarify and simplify the already voluminous record, and also to correct certain errors in the original *pro se* document, counsel submitted a Motion for Leave to File an Amended Complaint. This motion was granted on June 13, 1974. Thereafter several motions were filed by the various New Jersey defendants. These included overlapping motions to dismiss, transfer, and for summary judgment as to the various defendants. Defendant Johnson filed an answer alleging several affirmative defenses. The motion for summary judgment was withdrawn, and a Memorandum in Opposition to Defendants Motion to Dismiss or Transfer was filed. At the hearing to consider disposition of the Motion to Dismiss or Transfer, counsel for all parties agreed that the elements of the case were severable into issues which properly belonged in the Eastern District of Pennsylvania, and issues which, but for the allegations of conspiracy, belonged in the District of New Jersey. After counsel was obtained for plaintiff in New Jersey for the claims arising from the jail riot, it was stipulated that a Second Amended Complaint would be filed by all

parties; it was further agreed that the claim of conspiracy would be dropped; that Counts II and III, (dealing with the jail riot and denial of medical treatment after the riot), would be transferred to the District of New Jersey, and that Count I, (dealing with the extradition issue), would be decided by this Court.[3] An Order embodying this agreement was signed on November 13, 1974.

Thus, with the elimination of those issues, the parties were then able to agree that there were no factual disputes with respect to the remaining claims. Accordingly, it was determined that the matter be submitted on plaintiff's Motion for Summary Judgment, on the basis of a supporting affidavit from plaintiff, defendant's answers to interrogatories, a stipulation of facts, and memoranda from both parties. A stipulation to this effect was entered into on February 14, 1975, and time frames were established for briefing. Hence, the record, as it now exists, is ripe for adjudication.

## II. NATURE OF RELIEF SOUGHT

We are faced at the outset with the necessity of examining the nature and scope of relief sought by plaintiff. That aspect of plaintiff's complaint which is before us (the due process and equal protection claims against Superintendent Johnson), alleges a cause of action arising under 42 U.S.C. § 1983; one which claims a violation of plaintiff's rights in connection with the manner in which the Interstate Agreement on Detainers was applied to him. This is not a class action. In fact, it appears that the only relief sought in the pleadings before us is a declaratory judgment to the effect that the Agreement on Detainers is unconstitutional. However, as part of our effort to clarify this issue, we wrote to Mr. Danzy to inquire whether the requested relief was so limited. By letter dated November 17, 1975, he affirmatively replied to

---

**3.** On each of Counts II and III, plaintiff sought compensatory damages of $3,000,000, and punitive damages of $6,000,000, and such other relief as the Court might deem proper. This is in stark contrast to the request for relief in Count I, in which plaintiff seeks only a declaratory judgment. We might add that the second amended complaint also was drafted by plaintiff *and his counsel.*

the effect that he was seeking only a declaratory judgment.[4]

### A. Belated Damage Claim

Parenthetically, we note that on January 15, 1976, a motion to amend the complaint to add a request for damages of $150.00, representing lost wages, while plaintiff was in New Jersey, was filed with the Court. Defendant Johnson objected to this motion for the following reasons: (1) the claim for damages was untenable because of plaintiff's previous representation that damages were not involved, a statement first made on March 22, 1974, and reiterated in the first and second amended complaints, which were filed on June 11, 1974, and November 14, 1974, respectively; (2) no prior complaint requested any relief, with respect to the constitutionality of the extradition statutes, other than a declaratory judgment; (3) counsel for both parties had entered into a stipulation on February 14, 1975, under which it was agreed that no evidentiary trial would be required; indeed, all facts contained in the record as then constituted were stipulated, and it was further agreed that all contested legal issues could be resolved by this Court solely on the basis of the plaintiff's motion for summary judgment; (4) plaintiff is bound by that stipulation; and (5) the allowance of such an amendment and the consequent necessary reopening of the entire matter at this stage would be prejudicial to defendant.

Amendments to pleadings in the context of this request for a third revision of the complaint are governed by Rule 15(a) of the Federal Rules of Civil Procedure:

> Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Plaintiff has not suggested: (a) that any new facts have been developed, (b) that he was unsure of his legal rights, or (c) any other meritorious reason which would justify such an amendment. *See Wealden Corp. v. Schwey,* 482 F.2d 550 (5th Cir. 1973); *Kirby v. P. R. Mallory & Co.,* 489 F.2d 904 (7th Cir. 1973), *cert. denied,* 417 U.S. 911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1974).

The core of plaintiff's argument in favor of the proposed amendment is his contention that the absence of a final determination on the merits justifies such an amendment in order to ensure that the Court reach the merits.

We cannot agree with plaintiff. If there had been an issue of damages for lost wages, it would and should have surfaced long before this eleventh-hour attempt to have yet a third amendment to the original complaint. *This motion to amend was presented twenty-four months after the initial complaint was filed, twenty-two months after counsel was appointed, and fourteen months after the second amended complaint was filed. It was filed, indeed, two months after we sought clarification, as a courtesy to plaintiff, of the particular scope of relief sought. In response to that request, we were advised in writing by plaintiff that he was not seeking any damages; indeed, he reiterated that declaratory relief alone was his goal; this was corroborated by his counsel. This is particularly significant for we are dealing not with a pro se complainant, but one who at all relevant times had been represented by counsel.* The motion appears to be nothing more than an afterthought to avoid dismissal for mootness. Because it involves ap-

---

4. Mr. Danzy's letter reads, in part:

> I am in receipt of a carbon copy of your Honor's letter, of November 13, 1975, to Ms. Vickers. [Attorney for Commonwealth of Pennsylvania].
>
> In response, thereto, I would like to state that I do not have a copy of the original complaint, and was unaware that it did not specifically seek damages. Furthermore, I was also unaware that it would require an amendment to the complaint, for damages to be considered by the Court.
>
> Therefore, I wish to withdraw that portion of my recent communication, of November 11, 1975, requesting compensation for the institutional wages lost by my unconstitutional extradition.

Letter of November 17, 1975 from James E. Danzy to Judge Fogel.

pending an entirely new and questionable aspect to the suit, because of the numerous opportunities in the past which plaintiff had, by invitation of the Court, to advance any new theories, which he failed to do, and because of its conflict with a stipulation knowledgeably and voluntarily entered into by his counsel with his consent, we hold that plaintiff has waived any damage claims with respect to this action, and accordingly deny the motion to amend. *See generally* 3 J. Moore, Federal Practice ¶ 15.-08[4] (2d ed.rev.1975).

### B. *Declaratory Judgment*

 Based upon this determination, it is clear that the only request for relief which we may consider is that seeking a declaratory judgment. In examining this claim, however, we must inquire as to the effect such a judgment would have upon plaintiff, were we to issue one in his favor. *See,* 28 U.S.C. § 2202. It is clear that plaintiff may not, by this civil rights action, collaterally attack either the validity of his New Jersey convictions or the sentences imposed in that forum. If he desires to make such a challenge, then his only recourse is to file a petition for a writ of habeas corpus.[5] Treating plaintiff's complaint as such a petition would not, however, advance plaintiff's cause. First, such

a construction of the complaint would necessitate the invocation of the requirement of exhaustion of state remedies, an event which has not occurred. *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); 28 U.S.C. § 2254(b).[6] *Second,* once an accused has been placed in the custody of the state demanding his extradition, the legality of the extradition may not be attacked by way of habeas corpus. *Johnson v. Buie,* 312 F.Supp. 1349, 1351 (W.D.Mo.1970). The jurisdiction of the state which has achieved the requisite custody of the accused to try him is not destroyed by unlawful extradition; a subsequent conviction and sentence is accordingly immune from attack on that basis. *Frisbie v. Collins,* 342 U.S. 519, 522, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Campbell v. Superintendent, Bland Correctional Farm Unit,* 391 F.Supp. 1238, 1240 (W.D.Va.1975); *Crow v. Coiner,* 323 F.Supp. 555, 557 (N.D.W.Va. 1971); and *Johnson v. Buie, supra.*[7]

It is apparent, therefore, that the only relief which plaintiff seeks, or may be permitted to seek, either directly or indirectly, is our declaration on the issue of the constitutionality of the statutes in question.

### III. MOOTNESS

 In determining whether a request for declaratory relief has become moot,

---

**5.** In *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), the Supreme Court held that when habeas relief is available it is the exclusive remedy. The fact that plaintiff could not, in this case, gain immediate release, because of the outstanding Pennsylvania sentences, would not bar review of the New Jersey convictions and sentences in a habeas corpus proceeding. *Peyton v. Rowe,* 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968); *Nelson v. George,* 399 U.S. 224, 90 S.Ct. 1963, 26 L.Ed.2d 578 (1970).

**6.** For this reason, we need not reach the question of the effect of the Supreme Court's recent opinion in *Stone v. Powell,* —— U.S. ——, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), on the scope of federal habeas review of state court convictions.

**7.** In *United States v. Toscanino,* 500 F.2d 267 (2d Cir. 1974), rehearing en banc denied, 504 F.2d 1380 (1974), the Second Circuit refused to follow *Frisbie.* In that case, however, American agents kidnapped the defendant in Uru-

guay, engaged in illegal surveillance activities, tortured the defendant, and abducted him to the United States for the purposes of criminal prosecution. The court applied the "shocks the conscience" test of *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), holding that the facts alleged, if true, would operate as a bar to prosecution of the defendant.

In a later opinion in *United States ex rel. Lujan v. Gengler,* 510 F.2d 62 (2d Cir. 1975), cert. den., 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975), the Second Circuit clarified its holding in *Toscanino,* stating that,

absent a set of incidents like that in *Toscanino,* not every violation by prosecution or police is so egregious that *Rochin* and its progeny requires nullification of the indictment. *Id.,* at 66.

Certainly the facts before us do not justify a departure from the long-standing rule enunciated in *Frisbie.*

the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

A. *Factors to be Weighed in Determining Whether the Court Should Decline to Grant the Relief Sought for Mootness*

Federal courts, in analyzing the mootness doctrine, have enunciated several factors which are considered relevant to a decision on that score.

■ *First,* the decisions elucidate the principle that when other remedies sought are not moot, the underlying issue may be decided. *See, e. g., McCabe v. Nassau County Medical Center*, 453 F.2d 698, 701–02 (2d Cir. 1971) (request for injunctive relief moot, but damage claim still viable). As we noted in Part II, *supra,* the *only* form of relief sought by plaintiff, until his attempted amendment, which was rejected for the reasons cited previously, was for a declaratory judgment.

■ *Second,* when the challenged action has continuing collateral consequences, although its direct effect has ceased, the controversy may still remain alive because of the indirect effects of the action. Thus, in *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), the Supreme Court held that a challenge to a criminal conviction was not rendered moot by reason of the expiration of defendant's sentence, because the conviction itself would have adverse collateral legal consequences for the defendant. *Id.,* at 55–56, 88 S.Ct. 1889. In the instant case, plaintiff's New Jersey convictions and sentences, which followed from his allegedly unconstitutional extradition, would seem to have presumptively adverse collateral consequences under *Sibron.*[8] *Id.,* at 57, 88 S.Ct. 1889. *See also, Jessup v. Clark,* 490 F.2d 1068, 1070 (3d Cir. 1973). However, plaintiff does not and cannot challenge his New Jersey convictions or sentences in this proceeding. (*See, supra,* Part II, B 429–431). *The narrow issue before us is the validity of the extradition proceeding.* Plaintiff has not alleged and our own independent review of the entire record before us does not support any finding of collateral consequence adverse to plaintiff which flow from the mere fact of his extradition.[9]

■ *Third,* it has been held that when a controversy is "capable of repetition, yet evading review" mootness is avoided. *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). We find this recurring controversy doctrine inapplicable on the record before us.

■ No suggestion has been made that plaintiff is in danger of being subjected to future out-of-state transfers in violation of his constitutionally mandated rights. Moreover, it is not sufficient, in order to trigger the application of the recurring controversy doctrine, to rest upon the proposition that there is a possibility of future wrongful transfer involving some *other* individual, when, as in this case, class action relief has not been sought. *Marchand v. Director, U.S. Probation Office,* 421 F.2d 331, 334 (1st Cir. 1970); and *Committee to Free the Fort Dix 38 v. Collins,* 429 F.2d 807, 812 (3d Cir. 1970). In *Marchand* the

---

**8.** Apart from the collateral consequences which may flow from the New Jersey convictions, Danzy faces the prospect of serving a three to five year sentence in New Jersey, at the conclusion of his Pennsylvania sentence. See note 2, *supra.*

**9.** In fact, we have been informed by the Pennsylvania Board of Probation and Parole, by an affidavit dated December 12, 1975, that, based on past experience and practice, and in view of Mr. Danzy's several sentences,

> Mr. Danzy's conviction and sentence from New Jersey will not prevent his parole when he becomes eligible for parole on February 9, 1992.

Affidavit of Herman Tartler, Secretary to the Board of Probation and Parole.

court faced the issue of the necessity of granting bail to a parolee apprehended on a parole violator warrant, pending a parole revocation hearing. Since the parolee's sentence expired during the pendency of the litigation, the government argued the issue was moot. The parolee asserted the recurring controversy doctrine. The court, in rejecting this doctrine, stated the following:

> In this case appellant has been unconditionally released from custody. The likelihood of his again being placed in the situation of which he complains is speculative. While appellant may be genuinely concerned with the outcome of this litigation, the courts traditionally have not undertaken an examination of the *bona fides* of litigants in these circumstances. *Where there has been no appreciable likelihood of the repetition of the order complained of with respect to the appellant, the recurring question doctrine has not been applied.* (emphasis supplied) (citations omitted)

*Marchand, supra,* 421 F.2d at 334.[10] The facts before us are virtually on all fours with the *Marchand* situation. Plaintiff's transfer to New Jersey has been accomplished. He has been returned to Pennsylvania. There is no evidence before us, of any other out-of-state charges pending against plaintiff which might result in future transfers either to New Jersey or to any other jurisdiction.

The subtle issue that remains stems from the suggestion by counsel for plaintiff,[11] that the facts of this case are such, that by their very nature, they will consistently evade review if we decline to decide the constitutional issue because we hold that it is moot. We disagree.

*First of all,* a timely and proper claim for damages would clearly have avoided, and in future cases would avoid a determination that the action is moot.[12]

*Second, no effort has ever been made to amend the complaint to include a request for class relief.* The very case on which plaintiff's counsel relies, *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), demonstrates clearly the effect which the class action status of a law suit may have on considerations of mootness. *Gerstein* involved a challenge to the constitutionality of pre-trial restraint, absent a judicial determination of probable cause. The named plaintiffs were all convicted before the case reached the Supreme Court, thus terminating the pre-trial restraints. Nevertheless, the Court held that "the termination of a class representative's claim does not moot the claims of the unnamed members of the class." *Id.,* at 110, n. 11, 95 S.Ct. at 861. *See also, Sosna v. Iowa,* 419 U.S. 393, 399, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); and *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). Thus, an action commenced in the future, presenting the same issues which plaintiff has attempted to raise in this case, as soon as notice of an impending transfer was given, coupled with a request for class

---

10. We recognize that the courts have, in some cases, applied a more relaxed standard. *See,* e. g., *United States v. W. T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). One must, however, in these cases, distinguish between actions involving challenged governmental activity, and actions in which the government is challenging private activities. In the latter case the plaintiff's continuing interest in the recurring actions of the defendant is assured. In the former case, one cannot assume that a recurrence of the defendant's activities will have any effect on the individual plaintiff. Therefore a stricter inquiry is required. *See, Committee to Free the Fort Dix 38 v. Collins, supra,* 429 F.2d at 812; "Mootness on Appeal in the Supreme Court", 83 Harv.L.Rev. 1672, 1682–85 (1970).

11. Made in a letter dated December 11, 1975, addressed to this Court. In this letter counsel suggested, for the first time, the possibility of amending the complaint to state a claim for damages, and argued, additionally, that under the rationale of *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), this case should not be found moot.

12. Such a claim was allowed in *Pierson v. Grant,* 357 F.Supp. 397 (N.D.Iowa 1973). There are, of course, other cases which have concluded that a claim of unlawful extradition does not state a cause of action under the Civil Rights Act, 42 U.S.C. § 1983. *See* e. g., *Johnson v. Buie,* 312 F.Supp. 1349 (W.D.Mo.1970). The point is, however, that in each case the plaintiff's claims were not held to be moot and a decision on the merits was reached.

relief, would negate any question of mootness.[13]

■ In light of the factual circumstances before us, we are convinced that none of the factors which support a finding of a justiciable controversy are applicable in this case. On the contrary, we believe that the facts compel our conclusion that this case is moot. We find support for this conclusion in the opinion of the Supreme Court in *Preiser v. Newkirk*, 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975).

### B. *Preiser v. Newkirk*

The factual backdrop for the holding in *Preiser* was as follows:

James Newkirk was an inmate in the New York prison system in 1971, confined at Wallkill Correctional Facility, a medium security institution. In 1972, a petition to form a prisoners' union was circulated at Wallkill. This produced a great deal of controversy and tension among the inmates, in part because the existing prisoner representative committee was hostile toward the union movement. The prison administration did not forbid or actively discourage the circulation of the petition; however, the administrators did monitor the level of unrest within the prison brought about by the clash of opinions. Newkirk was identified in a report prepared by the assistant deputy superintendent as one of the inmates who had been canvassing for the union. The report did not, however, charge him with any violations of regulations or misconduct. The report was apparently based only upon information received by the assistant deputy superintendent from other officers at the institution. Newkirk was not consulted in connection with its preparation. On the strength of the report, the superintendent called the central office of the Department of Corrections and arranged for the transfer of several inmates, including Newkirk, to other facilities in the prison system.

Two days after the call, Newkirk was called to the infirmary, and summarily told of the transfer. Thereafter, he was sent to Clinton Correctional Facility, a maximum security institution. The Supreme Court agreed that the transfer had significantly altered Newkirk's conditions of confinement. Privileges were more restricted, access to the library was more limited, doors were locked, and the rehabilitation programs were less extensive. Also, Newkirk's family was 300 miles from Clinton, compared to 80 miles from Wallkill, which made visitation more burdensome.

Newkirk and three other prisoners brought suit seeking (1) a declaratory judgment to the effect that the transfers violated the Constitution and the laws of the United States, and (2) an injunction which would, (a) order their return to Wallkill, (b) expunge all record of their transfer, and (c) prohibit future transfers without a hearing. During the pendency of the action before the district court, the other three plaintiffs were released and Newkirk was retransferred to Wallkill. The superintendent of Wallkill also had a memorandum placed in Newkirk's file

which explained the nature of the transfer, noted that the transfer was not for disciplinary reasons, and was not to have any bearing on eligibility for parole or the decisions of the time allowance committee.

*Id.* at 399, 95 S.Ct. at 2333.

### 1. *District Court*

The district court dismissed the action as to all except Newkirk. As to him, the Court held that the transfer violated his constitutional rights, and issued a declaratory judgment requiring: (1) that Newkirk be given an explanation of reasons, and an opportunity to be heard in connection with any future transfer, and (2) that no adverse parole action be taken against Newkirk because of the transfer. It refused to issue an injunction against future transfers with-

---

**13.** The fact that plaintiff may not have been aware of the possibility of such a suit does not diminish the improvidence of any review we might make at this time of the merits of his claim. Even assuming plaintiff's ignorance in this regard, an after-the-fact declaration of plaintiff's rights would not, in this instance, provide plaintiff with any remedy or relief.

out notice or an opportunity to be heard, because it "was 'not persuaded that the threat of transfer is sufficiently great at this time . . . '." *Id.*

### 2. *Court of Appeals action in Preiser v. Newkirk*

The Court of Appeals for the Second Circuit affirmed the judgment with some modification. 499 F.2d 1214 (2d Cir. 1974). That court specifically held that the suit was not moot, despite the fact that Newkirk was returned to Wallkill. The court said in explanation, that

[even] after his return he remained subject to a new transfer at any time . . . .

*Id.* at 1219. The Court of Appeals also was not convinced by the good-faith assurances of prison officials that the transfer would have no adverse effects on Newkirk's parole situation, and accordingly held that Newkirk was "entitled to a judicial decree . . . ." *Id.*

### 3. *United States Supreme Court Disposition of Preiser v. Newkirk*

The Supreme Court reversed, on the basis that the issue was moot. After enunciating the general standards for determining questions of mootness, the Court listed the following factors which, it held, precluded review of the merits of Newkirk's claims.

FIRST: the case was not filed as a class action.

SECOND: damages were not sought.

THIRD: Newkirk would suffer no adverse collateral consequences as a result of his transfer. In fact, an explanatory notation had been put in his file which expressly barred consideration of the transfer in connection with any future parole determinations.

FOURTH: there was no reasonable expectation that the wrong would be repeated.

FIFTH: the facts of the case did not fall "within that category of harm 'capable of repetition, yet evading review.' . . . ." 422 U.S. at 403, 95 S.Ct. at 2335.

Mr. Justice Marshall concurred in the opinion because for some reason petitioner did not file this case as a class action. *Id.*, at 404, 95 S.Ct. at 2335. (Marshall, J., concurring).

### C. *Danzy's Claims*

We hold that an examination of the facts of the case before us within this framework dictates the same result.

FIRST: As in *Preiser*, and as we noted previously, no class relief was sought.

SECOND: no *timely* demand for damages was made. See discussion at pp. 429–431, *supra.*

THIRD: the only adverse collateral consequences which plaintiff may suffer are consequences which we are powerless to prevent, and for which plaintiff has not requested and cannot request relief. pp. 430–431, *supra.*

FOURTH: as we stated earlier (*supra*, pp. 432–433), there is no evidence that the alleged wrong to plaintiff will recur.

FIFTH: the facts of this case do not fall within the category of harm "capable of repetition, yet evading review." (*supra*, pp. 433–434).

Declaratory judgments should not be granted when they will be merely advisory opinions. *Preiser v. Newkirk, supra; Maryland Casualty Co. v. Pacific Co., supra.* This case presents such a situation, and we decline to issue any judgment of a purely advisory nature.

[F]ederal courts are without power to decide questions that cannot affect the rights of litigants in the case before them.

*North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971). The action will accordingly be dismissed for failure to present a live justiciable case or controversy. *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). An appropriate Order will be entered.