**MICHAEL R. SALA, Petitioner**

**v.**

**AMERICAN SAMOA GOVERNMENT, Defendant**

High Court of American Samoa
Trial Division

CA No. 35-92

May 21, 1992

Before RICHMOND, Associate Justice, AFUOLA, Associate Judge, and MATA'UTIA, Associate Judge.

Counsel: For Petitioner, John L. Ward II
For Defendant, Jennifer Joneson, Assistant Attorney General

This action seeks declarations on plaintiff Michael R. Sala's rights with respect to proceedings to terminate his employment by defendant American Samoa Government (Government).

## FINDINGS

The evidence before the Court consists solely of documents offered by the parties and admitted. The relevant and material facts provided by these documents for purposes of this opinion are as follows:

1. Plaintiff is a career service employee of the Government. On August 23, 1991, he held the position of Deputy Commissioner in Government's Department of Public Safety (DPS). His duties included the functions described in paragraph 4 of these findings.

2. On August 23, 1991, the Acting Governor, pursuant to A.S.C.A. § 4.0302, issued a memorandum to the Commissioner of Public Safety (Commissioner) authorizing the Commissioner to appoint a "Special Board of Inquiry" (BOI) to investigate allegations of criminal violations of plaintiff as the driver of a motor vehicle in a traffic accident on or about August 6, 1990, in American Samoa, and to provide a report and recommendations to the Commissioner and Attorney General's Office. The memorandum also directed the BOI to "conduct its proceedings pursuant to the Administrative Procedures Act (APA), and in accordance to the laws and regulations pertaining to career service employees of the American Samoa Government."

3. On September 20, 1991, plaintiff's attorney wrote to Michael Fuiava, who is a Deputy Commissioner of Public Safety in charge of DPS operations and was the BOI's Chairman. This letter appears to have been written when plaintiff's attorney first became aware of the BOI's activities. It informed the Chairman that plaintiff would not make any further written statements to the BOI in view of the pending personal-injury action. It also questioned both the Governor's authority to delegate his power to appoint a board of inquiry and the lack of procedural rights afforded plaintiff in the BOI proceedings to that date under the APA and career service laws or rules.

4. The "Report on the Findings, Conclusions and Recommendations of the Special Board of Inquiry," dated November 8, 1991, was addressed to the Commissioner and Attorney General. The title page, Table of Contents, and the first 11 pages and part of Page 12 are in evidence in this action. The report shows that:

a. In addition to Chairman Fuiava, the BOI's members were the DPS Commander in charge of the Training Division, DPS Commander in charge of the Office of Motor Vehicles and Highway Safety, DPS Commander in charge of the Records Office, and DPS Commander in charge of Administration and Finance. The Chairman is of equal rank to plaintiff. The other members are of lower rank.

b. The Commissioner requested the Attorney General to provide legal counsel for the BOI. Assistant Attorney General Ripley was assigned to this role.

c. The BOI took note of the DPS Standard Operating Procedures (SOP), which govern internal investigations of alleged improprieties or misconduct of DPS employees and provide for a board of inquiry to make findings and recommendations to the Commissioner. In cases of proposed adverse disciplinary action, the SOP provides that proceedings of such boards of inquiry shall be conducted subject to applicable territorial and federal laws, apparently referencing the due process requirements in A.S.C.A. Title 4 and A.S.A.C. Title 4.

d. The BOI decided that the SOP was not applicable to its proceedings for two reasons. First, the SOP requires that the members be of equal or higher rank to the employee subject to those proceedings. The BOI Chairman was the only available person who met this requirement, which necessitated the Acting Governor's action to authorize the BOI. Second, the SOP, despite their approval by the Commissioner and Governor, had not been adopted under the formal rule-making process. Thus, the BOI decided to use the SOP only as a guideline.

e. The BOI also decided to conduct its proceedings as an investigatory process rather than as a contested-case hearing under the APA. Thus, the BOI did not afford plaintiff the contested-case requirements of reasonable notice of the hearing and opportunity to respond, present evidence and argument, and conduct cross-examination at the hearing. Rather, it took statements under oath by witnesses appearing voluntarily or by subpoena and considered documentary evidence such as police reports, witness statements, and photographs.

f. The BOI began its investigation on August 27, 1991, by reviewing official DPS reports. Witnesses gave statements at various times between August 30 and October 1, 1991, when they and at least three BOI members were available. The accident scene was viewed by the

BOI on September 3, 1991.

g. During its investigation, the BOI also decided to expand the scope of its inquiry to include the manner in which the traffic accident investigation was carried out by DPS employees in light of conduct by them that, if substantiated by sufficient evidence, could lead to charges involving obstructing justice, tampering with evidence and perjury by some or all of these employees.

h. The Table of Contents indicates the report covers circumstances leading to and at the traffic accident, the conduct of the investigation and follow-up investigation by various DPS employees and an employee of the Attorney General's Office, and plaintiff's involvement in the conduct of the investigation on general dates, beginning August 13 and ending September 19, 1990. It also lists conclusions and recommendations regarding plaintiff in terms of six territorial laws on speeding, general duty of driver, careless driving, driving while under the influence of intoxicating liquor, causing bodily injury, tampering with or fabricating physical evidence, and tampering with a witness.

5. On November 15, 1991, the Commissioner of Public Safety served plaintiff with Commissioner's Office Memorandum No. 61-91, entitled "Notice of Charges Re Traffic Accident on August 6, 1990." The Notice informed plaintiff that the BOI had completed its investigation and recommended plaintiff's prosecution on criminal charges and adverse disciplinary action by termination of his employment. Plaintiff was given three days to respond to the memorandum, which he did in writing on November 18, 1991.

6. On November 15, 1991, the Commissioner also issued to plaintiff Commissioner's Office Memorandum No. 62-91, entitled "Notice of Placement of [sic] Annual Leave." This Notice, on the basis of the BOI report and the sensitive nature of plaintiff's position and responsibilities in the Department, relieved plaintiff from all duties of his position and placed him on annual leave, effective immediately, until resolution of the underlying matter.

7. Plaintiff responded on November 18, 1991, at length and in detail. He denied each of the alleged statutory violations, and for most allegations provided further comment. He also protested the denial of rights under the ABA career service laws and rules, specifically citing A.S.A.C. § 4.1026 and SOP § 4.1. He then continued with comments

53

on the lapse of time after the traffic accident before the BOI was convened and on details of certain events and his actions after the traffic accident. He concluded by commenting on the BOI's recommendations, the validity of its report, again the lapse of time, and the importance of his role as the head of the Government's operations within DPS in connection with the programs of the South Pacific Islands Criminal Intelligence Network (SPICIN) and the U.S. National Central Bureau (Interpol).

8. On November 18, 1991, the Acting Governor, by memorandum to the Commissioner, restored plaintiff to his position as head of the Government's SPICIN and Interpol operations.

9. On November 25,1991, Assistant Attorney General Ripley wrote to plaintiff's attorney to follow up on their conversation on November 21, 1991. This letter indicated that the Commissioner would return plaintiff's November 18, 1991, response for attorney-client consultations as may be appropriate and would allow more time to respond in any event. Mr. Ripley also stated he had advised the Commissioner that only the Commissioner, and no BOI member, can participate or advise in any final or recommended agency decision for disciplinary action.

10. On November 27, 1991, plaintiff's attorney responded to Mr. Ripley's letter. This letter identified four concerns with the disciplinary proceedings. First, the Attorney General's Office was still plaintiff's attorney of record in the personal injury action, which arose out of the August 6, 1990, traffic accident and was still pending, and directly participated in the BOI proceedings, allegedly causing a conflict of interest. Second, the entire BOI report was sent to the Commissioner while plaintiff's attorney interpreted the Acting Governor's authorization of the BOI to limit this action to only the BOI's recommendation. Next, the BOI proceedings did not comply with the APA or the administrative rules governing disciplinary action against career-service employees. Finally, the bulk of the report dealt with matters outside the scope of the Acting Governor's authorization, to wit, the traffic citations, which had been alleged in the personal-injury action complaint but were later acknowledged as not in fact having been issued. For these reasons and other violations of plaintiff's rights, he advised the Attorney General's Office that plaintiff would not participate in the BOI proceedings, urged withdrawal of the BOI report and the BOI's dissolution, objected to the Commissioner's taking disciplinary action against plaintiff due to the BOI's review of plaintiff's November 18, 1991, response, and cited

54

conflicts of interest of the Attorney General's office and DPS as preventing further action in this matter.

11. On February 7, 1992, the Commissioner forwarded the BOI report, Commissioner's Office Memorandum No. 61-91 of November 15, 1991, and plaintiff's written response of November 18, 1991, to the Director of Human Resources (Director) and, stating that plaintiff's "acts and misconduct in this matter have adversely reflected upon the dignity, integrity and prestige of the governmental service," recommended that plaintiff be terminated from employment with the Government. The Commissioner did not request plaintiff's suspension with or without pay pending removal.

12. On February 10, 1992, plaintiff's attorney wrote to the Director. This letter requested the Director not to take action on the Commissioner's February 7, 1992, memorandum until the Commissioner's conflict of interest and the legality of the BOI's action were resolved and the Attorney General's "special investigator's" findings were known, citing improprieties in the BOI proceedings, the Commissioner's violation of A.S.C.A. § 4.1034, and the Attorney General's decision to obtain outside counsel to handle the matter.

13. On February 25, 1992, the Director responded to plaintiff's attorney. This letter denied the request not to take further action.

14. On February 25, 1992, the Director of Human Resources, by memorandum to plaintiff, notified plaintiff that the Director was terminating plaintiff's employment with the Government, effective March 28, 1992, and suspending plaintiff from his duties, which was implemented without pay, for 30 days from February 26 to March 27, 1992. The notice informed plaintiff that the Director had carefully reviewed this matter and concurred with the Commissioner's recommendation as reasonable. It further advised plaintiff that his termination was based on plaintiff's "conduct unbecoming a reliable and dependable employee of the Government," citing specifically charges of "speeding, careless driving, driving while under the influence of intoxicating liquor, causing bodily injury, tampering with and/or fabricating evidence, and failure to exercise care while operating a government vehicle" arising out of the traffic accident on August 6, 1990. The letter also advised plaintiff that he was entitled to request, within ten days, a hearing before the Government's Personnel Advisory Board (PAB) on this matter and that he had certain rights and procedures related to his hearing process.

55

15. On February 26, 1992, plaintiff's attorney again wrote to the Director. This letter pointed out that the Acting Governor's August 23, 1991, authorization specifically directed compliance with the APA and the requirement of the Act that investigatory proceedings and reports must conform with an investigatory board's convening order.

16. On February 28, 1992, plaintiff formally requested a hearing before the PAB, which was then scheduled on March 16, 1992, by the Director. Before the hearing date, plaintiff requested additional preparation time and disqualification of the Attorney General's Office from representing the Government at the hearing. The Attorney General's Office agreed on the Government's behalf to both requests. On March 13, 1992, plaintiff filed this action for declaratory relief. In a hearing before this Court of March 27, 1992, the parties agreed, among other things, that at plaintiff's request the PAB hearing would be delayed until after a final decision in this action.

## DISCUSSION AND CONCLUSIONS

1. Actual Controversy

We first address the issue of whether or not there is an actual controversy relating to the legal rights and duties of the parties, which is the core requirement of a declaratory relief action. A.S.C.A. § 43.1101. There must be a justiciable issue based on alleged facts showing, under all the circumstance, that there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant issuance of a declaratory judgment. The test generally applied is the relative certainty that litigation will eventually follow if declaratory relief is not granted. *In re High Chief Title Mauga*, 4 A.S.R. 132 (Trial Div. 1974); *Danzy v. Johnson*, 417 F. Supp. 426 (E.D. Pa. 1976), *aff'd*, 582 F.2d 1273 (3d Cir. 1978).

Plaintiff is a career service employee of the Government. The Government proposes to terminate plaintiff's employment through the adverse or disciplinary action process applicable to career-service employees. Plaintiff is challenging the due-process adequacy of the procedures to date. It is difficult to frame a more direct and immediate controversy involving legal rights and duties of parties that has high potential to result in future litigation if the alleged errors are not resolved now. An actual controversy exists.

2. Refusal to Hear

56

Despite the presence of an actual controversy, the Court still has discretion to refuse declaratory relief when, under all the circumstances, it is not necessary or proper at the time it is sought. A.S.C.A. § 43.1102. Application of this statute properly involves analysis of the administrative-law principle that the exhaustion of administration remedies is a prerequisite to judicial review in the context of a declaratory-relief action.

The exhaustion of administrative remedies standard does not absolutely preclude earlier judicial action, but such action is permissible only in exceptional circumstances. In disciplinary matters, a public employee need not await a final agency decision only if a preliminary agency decision clearly and unambiguously violates a statutory or constitutional right of the employee or if the prescribed administrative process is clearly inadequate to prevent irreparable injury. *Barnes v. Chatterton*, 515 F.2d 916 (3d Cir. 1975); *American Fed'n of Gov't Employees, Local 1004 v. Resor*, 442 F.2d 993 (3d Cir. 1971); *Fitzgerald v. Hampton*, 467 F.2d 755 (D.C. Cir. 1972); *Athas v. United States*, 597 F.2d 722 (Ct. Cl. 1979).

Since the PAB hearing remains as a significant step in proceedings to terminate plaintiff's employment, administrative remedies are clearly not yet exhausted. The Court cannot and will not speculate on the outcome of this hearing.

A further factor is avoidance of judicial administration of executive-branch processes. The Court is in no position in theory or practice to take on the executive's functions to administer territorial laws and rules. *Election Office of Am. Samoa Gov't v. Tuika*, 9 A.S.R.2d 1 (Trial Div. 1988).

With these limiting principles in mind, we turn to analyzing the substantive issues.

3. Misconduct investigation

Disciplinary action against public employees almost invariably starts with an investigation of some kind into the misconduct resulting in discipline. Normally, such investigations are informal and do not involve due-process requirements. They may, however, require certain due-process procedures when an underlying statute or regulation specifies particular procedures to follow. For specific examples and discussion of principles, see *Morgan v. United States*, 304 U.S. 1 (1938); *Green v.*

57

*McElroy*, 360 U.S. 474 (1959); *Hannah v. Larch*, 363 U.S. 420 (1960); *Federal Communication Comm'n v. Schreiber*, 381 U.S. 279 (1965).

The type of investigation required in this case depends on whether the board of inquiry provisions of the SOP or the contested case provisions of the territorial APA, A.S.C.A. §§ 4.1025-4.1037, or both, apply to the disciplinary process. Both the SOP and APA afford a person under investigation basic due-process rights, summarized, for purposes of this discussion, as notice of the hearing, including a concise statement of allegations, and a right to a hearing at which there is an opportunity to respond and present evidence and argument on all issues involved and conduct cross-examination. SOP §§ 4.1.3, 4.1.4; A.S.C.A §§ 4.1025, 4.1026.

The SOP was approved by the Commissioner and the Governor, but it has not been adopted pursuant to the rule-making procedures set forth in the APA, specifically A.S.C.A. § 4.1020. Thus, it is not an administrative rule as defined in A.S.C.A. § 4.1001(g), having the force and effect of law. It is, however, effective as a statement of internal DPS management, which requires no formal adoption process.

Although it is intended to be applicable as an internal management tool to all disciplinary actions involving DPS employees, the SOP, by its own terms, could not work in the disciplinary proceedings against plaintiff. SOP § 4.1.2 clearly provides that the board of inquiry must consist of four or five members "selected from among employees of the department of equal or higher rank than the employee against whom disciplinary actions [sic] is brought." Excluding the Commissioner, the only person qualified to serve as a member was the Deputy Commissioner who was eventually named as Chairman of the BOI.

Whether or not the Acting Governor issued the BOI convening order of August 23, 1991, exclusively due to this limitation in the SOP, he did, pursuant to A.S.C.A § 4.0302, authorize the BOI investigation.

This convening order delegated the authority to select the BOI members to the Commissioner. Plaintiff's argument that executive appointments must remain with the Governor may reflect sound policy, but so long as A.S.C.A. § 4.0131 allows the Governor and other executive branch officials to delegate their authority, but not their responsibility, without limitation, this delegation of appointing authority was proper. We do not believe that other existing statutes on executive-branch appointments limit A.S.C.A. § 4.0131.

58

Four of the BOI members appointed by the Commissioner were DPS employees of lesser rank than plaintiff. These appointments were contrary to the principle of SOP § 4.1.2 and certainly raise the possibility that these members might be influenced by aspirations for plaintiff's position. However, there is no evidentiary basis for finding any such motivation at work in this case. Although it may have been unwise not to select persons at the deputy or higher level from Government agencies outside of DPS, we conclude that there was no error at law in the makeup of the BOI as appointed.

The convening order also provided that the BOI "shall conduct its proceedings pursuant to the Administrative Procedures Act." A.S.C.A. § 4.0302(b) states that "proceedings and reports of a board of investigation shall be as designated by the Governor in the order convening any such board." The APA has three distinct parts, which are rule-making, contested cases, and judicial review. Since the BOI was not involved in either rule-making or judicial review, the reference can only mean the contested-cases provisions and their procedural due-process requirements. These due-process rights were expressly denied to plaintiff by the BOI.

The denial of plaintiff's fundamental rights, which are established not only statutorily but also constitutionally, Rev. Const. Am. Samoa Art. I, § 2 (1967), brings this case within the violation of statutory or constitutional rights exception to the exhaustion of administrative remedies principle for purposes of declaratory-relief actions. Hence, the disciplinary action taken to date to terminate plaintiff's employment for conduct related to the traffic accident on August 6, 1990, must be and is declared null and void *ab initio*. Plaintiff must be and is restored to his position as Deputy Commissioner in the DPS, which he held on November 15, 1991, with all pay and benefits restored from November 16, 1991, forward, including all earned annual leave which he may have been required to take in connection with the employment termination proceedings against him. Judgment will be entered accordingly.

Since our conclusion that the investigatory phase of the employment-termination proceedings against plaintiff is fatally flawed is dispositive of this action, we decline to address plaintiff's other allegations of denied rights. Advisory opinions in declaratory-relief actions are properly avoided. *Danzy v. Johnson*, 417 F. Supp. 426 (E.D. Pa. 1976), *aff'd*, 582 F.2d 1273 (3d Cir. 1978).

It is so ordered.